UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                            :

WINN CONSULTING LLC,           :

                            :

             Plaintiff,     :

                            :

    - against -          :

                            :

CIRCLE LINE-STATUTE OF    :
LIBERTY FERRY, INC.,

                            :

             Defendant.   :

                            :
-----------------------------------------------------X
SHIRA A. SCHEINDLIN, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/23/07

**OPINION & ORDER**

06 Civ. 1589 (SAS)

## I.   INTRODUCTION

Winn Consulting LLC ("Winn"), brings this action against Circle Line-Statute of Liberty Ferry, Inc. ("Circle Line"), for breach of contract.  In June 2005, Winn and Circle Line executed a Letter of Intent ("LOI") in connection with a proposed purchase by Winn of the assets of Circle Line.  The transaction fell through and Winn filed this lawsuit, claiming that Circle Line owes it termination fees and expenses of $845,968, plus interest and costs, pursuant to a reimbursement provision contained in the LOI.[1]  In opposition, Circle Line maintains that a condition precedent to Winn's entitlement to reimbursement fees

---

[1]    *See* Complaint ¶ 27.

never occurred, because Winn never made a "Firm Offer" for Circle Line's assets in accordance with the LOI's definition of that term. The parties filed cross-motions for summary judgment. For the reasons stated below, Winn's motion is denied and Circle Line's motion is granted.

## II.   BACKGROUND[2]

### A.   Letter of Intent

On June 13, 2005, Kevin Moran, as the President of Circle Line, and Matthew Winn ("Mr. Winn"), as the principal and sole member of Winn, executed the LOI, thereby establishing a timetable and framework for Winn's intended purchase of Circle Line's assets.[3] The three LOI provisions relevant to the parties' cross-motions are titled "Diligence Period," "Reimbursement Right," and "Definitive Documents."[4]

The Diligence Period provision established a forty-five day period for

---

[2]   Unless otherwise noted, the following facts are undisputed. For ease of reference I cite solely to Winn Consulting's Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1").

[3]   *See* Pl. 56.1 ¶ 1. Unless otherwise noted, all events described herein took place in 2005.

[4]   LOI at 1-4, Ex. A to Declaration of Terence W. McCormick, counsel for Winn ("McCormick Decl.").

Winn to perform due diligence.[5]  Circle Line agreed to assist in this process by providing Winn with all reasonably requested information, direct access to Circle Line's auditors, tours of Circle Line's facilities and opportunities for Winn to physically inspect Circle Line's vessels.[6]  The provision further stated that the parties had agreed "to work together in good faith to complete the due diligence in a cost efficient, expedient manner that minimizes disruption to [Circle Line's] business."[7]

The Reimbursement Right provision set forth Circle Line's obligation to pay Winn reimbursement expenses in the event that (1) Winn submitted a Firm Offer to Circle Line during the Diligence Period, and (2) Circle Line breached its attendant duty to either "respond" or "enter into" the transaction documents.[8] Because the parties vigorously dispute the meaning of the Reimbursement Right provision, I quote its pertinent language:

Reimbursement Right

---

[5]   *Id*. at 1. The Diligence Period was originally noticed to commence on June 15, but the parties subsequently agreed that it would be measured from July 28. *See* Pl. 56.1 ¶ 5.

[6]   *See* LOI at 1.

[7]   *Id*.

[8]   *Id*. at 2.

> *If at any time within the Diligence Period*, (i) Winn makes a written final offer to [Circle Line] to purchase all of [its] assets . . . including but not limited to all physical property, concessions, inventory, and insurance claims ("the Transaction"), for a price of $52 million payable in cash at closing . . . *and to consummate the Transaction* for the Purchase Price *in accordance with the Definitive Documents* as outlined below, (the "*Firm Offer*"), *and* (ii) [Circle Line] *fails to respond or enter into such Definitive Documents* within thirty (30) days from the date of the Firm Offer (such event a "Firm Offer Refusal"), then Winn shall have the right . . . to be (a) paid a termination fee of two hundred and fifty thousand dollars ($250,000) and (b) reimbursed up to (i) two hundred and fifty thousand dollars ($250,000) of the actual and documented out-of-pocket expenses incurred by it in connection with due diligence for the Transaction, and (ii) five hundred thousand dollars ($500,000) of the actual and documented out-of-pocket expenses incurred by it in connection with procuring third party financing for the Transaction . . . .
>
> If the Firm Offer is delivered by Winn and accepted by [Circle Line], the [parties] shall execute the Definitive Documents no later than five business days after the date of acceptance by [Circle Line]. If [Circle Line] fails to enter into the Definitive Documents within such period, the payments set forth in (a) and (b) above shall become immediately payable to Winn . . . .[9]

The term "Definitive Documents," as used above, is defined elsewhere in the LOI

as including "an Asset Purchase Agreement, legal opinions, and the other

documents contemplated in the Asset Purchase Agreement."[10]

---

[9]    *Id.* (emphases added).

[10]    *Id.* at 4.

Attached to the LOI is a Term Sheet to accompany the contemplated Asset Purchase Agreement ("APA"). As evidenced by the Term Sheet, the parties always contemplated that Winn would acquire the assets subject to "Permitted Encumbrances."[11] The Term Sheet also provides that on the Closing Date ("Closing"), Winn would "assume and discharge certain liabilities of [Circle Line] (the 'Assumed Liabilities') to be listed in the APA," and that all other financial obligations arising out of Circle Line's operations, incurred prior to the Closing, would be "Excluded Liabilities."[12]

### B.    The J.P. Morgan Chase Loans

Circle Line's single largest liability was a debt of approximately $7 million, comprised of two loans from J.P. Morgan Leasing, Inc., that were secured by two mortgages on vessels in the Circle Line fleet ("J.P. Morgan Chase Loans" or "Vessel Mortgages").[13] These loans are a source of dispute in this action, for each party asserts it had been mutually agreed that the other would assume liability

---

[11]    Term Sheet, Ex. 1 to Declaration of George B. Freehill, counsel to Circle Line ("Freehill Decl."). The Term Sheet's preface states: "The following is a term sheet of the Asset Purchase Agreement ("APA") contemplated in the LOI. It is anticipated that the APA will contain at least all of the terms set forth below." *Id*.

[12]    *Id*. at 2.

[13]    *See* Pl. 56.1 ¶ 9.

for the Vessel Mortgages at Closing.[14]

During the Diligence Period, the parties' respective counsel negotiated the terms of the APA, exchanging various drafts.[15]  Mitchell Lubart, of Hogan & Hartson LLP ("Hogan"), was lead counsel for Winn.[16]  Joshua Korff, of Kirkland & Ellis LLP ("Kirkland"), supervised the drafting process on behalf Circle Line.[17]  In their submissions to the Court, the parties discuss variations in the many drafts, at length and in great detail.  Suffice it to say that among the provisions repeatedly subjected to black-lining – to insertion, deletion, and rewording – were those addressing what would happen, at Closing, to Circle Line's indebtedness; some, but not all, of these provisions mentioned the J.P. Morgan Chase Loans by name.[18]

---

[14]     *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment  ("Pl. Mem.") at 5-6; Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def. Mem.") at 12-13.

[15]     *See* Pl. 56.1 ¶ 6.

[16]     *See id.* ¶ 7.

[17]     *See id.* ¶ 8.

[18]     *See id.* ¶¶ 13-32.  For example, on July 5, Kirkland circulated comments to a draft APA proposing to insert a clause that would have required Winn to assume, at Closing, "any Liability secured by a security interest in any of the Assets." 7/5/05 APA Draft, Ex. E to McCormick Decl., Section 2.4(a)(vii).  In that same draft, Kirkland also proposed striking a provision that would have required Circle Line to retain, at Closing, any "liability arising out of or relating to [Circle Line's] credit facilities or any security interest related thereto."  *Id.* Section 2.4(b).  Hogan

Additionally, the lawyers circulated markup drafts of the Schedules to the APA ("Schedules"), a document that is cross-referenced throughout the APA. The Schedules contained, *inter alia*, Circle Line's representations and warranties regarding the J.P. Morgan Chase Loans. Only two drafts of the Schedules were ever exchanged between the teams of lawyers. The first one, circulated by Kirkland and dated July 29, contained a section titled "Title to Assets; Encumbrances," which explicitly provided that the mortgages financed by the J.P. Morgan Chase Loans constituted "Permitted Encumbrances" that would pass to Winn at closing.[19]

Kirkland circulated this draft one day after the Diligence Period was initially set to expire.[20] The Diligence Notice from Circle Line was dated June 13, and thus the Diligence Period was initially set to expire July 28.[21] However, at a July 28 meeting held at Kirkland, the parties agreed that Winn should have an additional forty-five days to complete its due diligence.[22]

---

responded to this draft by circulating a markup that rejected both of these proposed provisions. *See* 7/6/05 APA Draft, Ex. F to McCormick Decl., Section 2.4.

[19] *See* Pl. 56.1 ¶¶ 23-25; 7/29/05 Schedules Draft, Ex. I to McCormick Decl., Section 3.8.

[20] *See* Pl. 56.1 ¶ 5.

[21] *See* Def. Mem. at 12.

[22] *See id*. *Accord* Pl. 56.1 ¶ 5.

7

Hogan had not yet circulated a markup in response to Kirkland's

July 29 draft of the Schedules when Moran sent an email on behalf of Circle Line,

dated August 2, to Jon Brooks, a Hogan associate, stating, in pertinent part:

> . . . don't expect a revised set of schedules in any form until we
> receive word that your client has essentially completed his due
> diligence period and is prepared to make a firm offer for the
> purchase of Circle Line's stock or its assets. Circle Line does
> not feel that it is prudent for us to match HH [Hogan &
> Hartson] lawyer for lawyer on this project and we will,
> therefore, focus our resources on supporting only those efforts
> that will lead to the successful and expeditious completion of
> due diligence. Thank you.[23]

Moran copied this email to the entire working group of lawyers for both parties,

and followed up by sending an explanatory email, dated August 5, to Mr. Winn.[24]

Moran informed Mr. Winn that in light of the extended Diligence Period, Circle

Line's Board was in "unanimous agreement that no further steps be taken by Circle

Line to advance the APA [or the Schedules]."[25]  Moran continued,

> the only way I see us getting back to expediting the APA
> simultaneous with due diligence (which is really more for your
> benefit than ours), would be for your rather hostile lawyers to
> show some sign of good faith and formally agree to shorten the
> due diligence period to the middle of August.  Otherwise we

---

[23]    *See* 8/2/05 Email from Moran to Brooks, Ex. 2 to Affidavit of Kevin Moran ("Moran Aff.").

[24]    *See* 8/5/05 Email from Moran to Mr. Winn, Ex. 3 to Moran Aff.

[25]    *Id*.

must wait for an offer from you or simply wait for the due diligence period to expire.[26]

Notwithstanding Circle Line's expressed desire to cease negotiating and drafting the APA and Schedules and its instructions to its lawyers accordingly, Brooks circulated a markup of Kirkland's July 29 draft of the Schedules to the working group of attorneys at both firms on August 12.[27]  In addition to other edits, Brooks had manually drawn "Xs" over the text of two provisions contained in Kirkland's previous draft – the two provisions that provided for Winn to assume liability for the Vessel Mortgages at Closing.[28]  Underneath these "Xs," in small block print, Brooks had written the word "None."[29]

---

[26]    *Id.* Despite its otherwise thorough and detailed chronology of communications between the principals and their lawyers, Winn's Rule 56.1 Statement fails to mention either of Moran's emails.  These omissions are particularly conspicuous because they were authored by a principal party, whereas many of the communications Winn belabors in its Rule 56.1 Statement were exchanged between junior or mid-level associates – individuals whose agency and authority to speak with finality on their clients' behalf is arguable.  In a contract action, where the context and chronology of events is critical to the Court's determination of whether the parties reached a meeting of the minds, Winn's failure to disclose Moran's communications tests the boundaries of accurately representing the facts. *See* Winn Consulting's Counter Statement of Material Facts Pursuant to Rule 56.1 Opposing Circle Line's Cross Motion for Summary Judgment ("Pl. Counter 56.1") ¶ 32 (admitting Circle Line's statements regarding the emails, but dismissing them as presenting "no genuine issue of material fact to be tried").

[27]    *See* 8/12/05 Schedules Draft, Ex. K to McCormick Decl.

[28]    *See id.*, Sections 3.8(a) and (b).

[29]    *Id.*

Kirkland never responded to Hogan's August 12 draft.  On August 22, Hogan attorney Maria Luisa Canovas emailed Kirkland attorney Hannah Kong, asking "please send your mark-up of the schedules today since we need to review them prior to [an August 23 conference call]."[30]  Kong replied to Canovas via email, stating that Kirkland had been instructed by its client not to devote further effort to the Schedules.[31]

### C.   Winn's Purported Firm Offer

On August 24, Mr. Winn wrote a letter to Circle Line that purported to be a Firm Offer to complete the transaction.[32]  Because the outcome of this lawsuit turns on whether this letter met the LOI's requirements for a Firm Offer, I quote its pertinent paragraphs:

> Dear Mr. Moran, Board and Shareholders:
>
> This letter constitutes a Firm Offer to consummate the Transaction for the Purchase Price in accordance with the Definitive Documents attached hereto.  In accordance with the LOI, this Firm Offer is valid until September 23, 2005.
>
> In accordance with the LOI, if you don't accept this Firm Offer by written notice to Winn prior to or on September 23, 2005, or you accept this Firm Offer but fail to enter into the

---

[30]   Pl. 56.1 ¶ 28.

[31]   *See id.* ¶ 29.

[32]   *See* 8/24/05 Letter from Mr. Winn to Circle Line ("August 24 Letter"), Ex. M to McCormick Decl.  Circle Line disputes Winn's characterization of the letter as a Firm Offer.  *See* Def. Mem. at 13-14.

> Definitive Documents within five days of your acceptance,
> Winn shall have the right . . . to be paid the amounts set forth in
> the LOI in the manner set forth therein.[33]

The single "Definitive Document" accompanying the letter was a draft APA; a

draft of the Schedules was not included.[34]  This draft APA made no explicit

reference to the J.P. Morgan Chase Loans, nor did it otherwise provide that Winn

would assume liability for such indebtedness.[35]

Two days later, Moran sent a letter to Mr. Winn acknowledging

receipt of the August 24 Letter, but also questioning Mr. Winn's "if you don't

accept" ultimatum.[36]  Moran pointed out that the language of the LOI "does not

require [Circle Line] to accept a firm offer in 30 days, only to *respond*."[37]  Mr.

---

[33]    August 24 Letter.

[34]    *See* Circle Line's Combined Statement of Material Facts Pursuant to Local
Rule 56.1 (A) and (B) in Opposition to Winn's Rule 56.1 Statement and in Support
of Circle Line's Cross-Motion for Summary Judgment ("Def. 56.1") ¶ 35.  Winn
argues that the draft APA accompanying its August 24 Letter was consistent, in all
material respects, with the most recent drafts exchanged between the parties'
respective counsel. *See* Pl. 56.1 ¶ 35.  Critically, according to Winn, it was
consistent with all draft APAs circulated on or after July 6, in that it did not
provide that Winn would assume liability for the J.P. Morgan Chase Loans at
Closing. *See id.*

[35]    *See* 3/24/05 Draft APA, Ex. M to McCormick Decl.

[36]    *See* 8/26/05 Letter from Moran to Mr. Winn, Ex. 4 to Freehill Decl.

[37]    *Id.* (emphasis added).

11

Winn, in turn, sent Moran a letter expressly reserving Winn's right to dispute

Circle Line's interpretation of the LOI.[38]

At a meeting of Circle Line's Board of Directors on September 14,

Kirkland attorneys informed Circle Line's management that the APA, if executed

in the form submitted by Winn on August 24, would not obligate Winn to assume

liability for the Vessel Mortgages.[39]

---

[38]    *See* 8/29/05 Letter from Mr. Winn to Moran, Ex. 5 to Freehill Decl.  Again,
Winn fails to mention this correspondence between principals in its Rule 56.1
Statement.  Only in responding to Circle Line's Rule 56.1 Statement does Winn
acknowledge the August 26 and 29 letters.  *See* Pl. Counter 56.1 ¶ 34.  At the same
time it admits these paragraphs, Winn opines that they "present no genuine issue of
material fact to be tried," as if this adequately explains why the facts contained
therein were omitted from its own 56.1 Statement.  *See id*.  Winn misreads Local
Rule 56.1, which requires parties moving for summary judgment to produce a
statement of "material facts as to which the moving party contends there is no
genuine issue to be tried." Local Rule 56.1.  Whether a fact is material is often
disputed by reasonable people, but lawyers are nevertheless obliged to make this
determination using honest judgment.  I harbor doubts that counsel consistently did
so here, and conclude that counsel was less than forthright in representing the
sequence of events leading up to this litigation.

[39]    *See* Pl. 56.1 ¶ 36.  It is undisputed that at no point prior to Winn's August 24
Letter did Kirkland, or any principal of Circle Line, communicate to Winn, nor did
Winn tell them that Winn's assumption of the Vessel Mortgages was a condition to
the closing of Winn's proposed acquisition of Circle Line.  *See id*. ¶ 41.  More
surprisingly, before September 14, neither the principals nor their lawyers ever
discussed the J.P. Morgan Chase Loans at any of their meetings, and thus the
principals' misunderstanding over these loans was not addressed for some time.
*See id*.

By letter dated September 21, Circle Line formally responded to Winn's August 24 purported Firm Offer.[40] The letter stated that Circle Line remained willing to consummate a transaction with Winn, but that Circle Line would not do so in accordance with the draft APA that had accompanied Winn's August 24 Letter.[41] Rather, Circle Line would execute a deal only "on terms outlined in the LOI" and according to a modified APA – one based on the assumption that the J.P. Morgan Chase Loans were "Permitted Encumbrances" that would pass to Winn along with the vessels.[42] The letter concluded by stating that Circle Line was "willing to negotiate the resolution of any outstanding issues" and would make its representatives available for meetings at Winn's convenience.[43]

The principals met once more in a final attempt to salvage the deal, but without success.[44] Shortly thereafter, by letter dated September 29, Mr. Winn made a formal demand on Circle Line for $845,968 of fees and expenses, pursuant

---

[40]   *See* 9/29/05 Letter from Moran to Mr. Winn, Ex. N to McCormick Decl. Winn argues that because Moran's letter enclosed a draft APA that was materially different from the draft Winn had submitted in its August 24 Letter, Moran's letter constituted a counteroffer that qualified as a Firm Offer Refusal under the LOI. *See* Pl. 56.1 ¶ 38.

[41]   *See* 9/29/05 Letter from Moran to Mr. Winn.

[42]   *Id*.

[43]   *Id*.

[44]   *See* Pl. 56.1 ¶ 43.

to the Reimbursement Right provision of the LOI.[45]  By letter dated October 3,

Circle Line rejected this demand.[46]

      Winn filed this action against Circle Line on February 28, 2006.  At

the heart of Winn's claims is its contention that Winn's August 24 Letter was a

valid Firm Offer, and therefore Circle Line's subsequent refusal to reimburse Winn

for its expenses incurred during the Diligence Period constituted a breach of the

LOI.[47]

## III.   APPLICABLE LAW

      Summary judgment is appropriate if the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[48]  An issue of fact is genuine "'if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.'"[49]  A

---

[45]    *See id.* ¶ 44.

[46]    *See id.*

[47]    *See* Pl. Mem. at 1.

[48]    Fed. R. Civ. P. 56(c).

[49]    *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)
(quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

fact is material when it "'might affect the outcome of the suit under the governing law.'"[50]

The movant has the burden of demonstrating that no genuine issue of material fact exists.[51]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[52]  To do so, it must show that there is more than a "'metaphysical doubt as to the material facts.'"[53]  In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[54]

## IV.   DISCUSSION[55]

---

[50]     *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[51]     *See, e.g.*, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[52]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[53]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[54]     *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[55]     The LOI contains a New York choice of law provision.

The crux of this dispute is whether or not Winn's August 24 Letter constituted a Firm Offer, thus satisfying a condition precedent to Winn exercising the buyer's Reimbursement Right.  In other words, "[i]f the August 24, 2005 offer to purchase Circle Line for $52,000,000 was not a 'Firm Offer,' then Plaintiff did not perform and the condition precedent to Circle Line's liability never arose."[56]

The August 24 Letter was not a Firm Offer for the simple reason that there was never a meeting of the minds with respect to a material term of the transaction, namely whether Winn would assume liability for the J.P. Morgan Chase Loans at Closing.  This defeats Winn's claim for reimbursement fees because, as Winn concedes, the "LOI logically required that the economically material terms of the APA be resolved before [Winn] would be able prudently to make a Firm Offer."[57]

---

[56]   Pl. Mem. at 11.  It is undisputed that liability for the Vessel Mortgages was a material term of the proposed transaction.  See id.

[57]   Id. at 12.  It is a basic principle that a contract cannot exist where the parties have failed to reach agreement on its material terms.  See 22 N.Y. Jur. 2d Contracts § 21 (2007) ("In order to create a binding contract, there must be a meeting of the minds as to the essentials of the agreement . . . . [N]o contract can be created where a material element has been left for future negotiations.").  See also Power Cooling Inc. v. Churchill Sch. and Ctr., 792 N.Y.S. 2d 452, 453 (1st Dep't 2005) (because "letter of intent did not contain all material terms of contract . . . there was no binding agreement"); Silverite Constr. Co., Inc. v. Montefiore Med. Ctr., 657 N.Y.S. 2d 196, 197 (2d Dep't 1997) (contract between construction company and medical center did not exist where parties never reached agreement on material terms, including overtime pay and amount of bonus for early completion).

16

The parties dispute whether, at the time they executed the LOI, there was mutual agreement regarding what would happen with the Vessel Mortgages. Winn denies ever agreeing to assume such indebtedness.[58]  Winn also observes that nowhere does the LOI "specify on its face" that the $7 million in mortgages would pass with the vessels, and submits that if such an arrangement had been intended, the purchase price set forth in the LOI would have been $59 million, as opposed to $52 million.[59]  In opposition, Circle Line argues that the LOI, read in conjunction with its Term Sheet, implicitly provided that the purchaser would assume liability for such indebtedness.[60]

In any event, because the LOI does not specifically address who would assume Circle Line's single largest liability at Closing, I have reviewed the record as a whole to determine whether the parties had reached an agreement on this issue at the time Winn submitted its purported Firm Offer.[61]  The record clearly demonstrates that they had not.[62]

---

[58]    *See* Pl. Mem. at 3.

[59]    *Id.*

[60]    *See* Def. 56.1 ¶ 10. *See also* Affidavit of Joshua N. Korff ¶ 13 ("Consistent with the LOI, Circle Line's understanding of the transaction continued to be that Winn would be assuming the J.P. Morgan Chase mortgages liabilities as part of any transaction.").

[61]    *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y. 2d 397, 399 (1977) ("In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective

Winn asserts that "in the drafting process the parties settled the material points of the proposed transaction and Winn made a Firm Offer on that basis."[63] Even considering the evidence in a light most favorable to Winn, and drawing every inference in its favor, this assertion is conclusory and contradicted by the record. With respect to the APA, Winn attempts to show that provisions relating to the Vessel Mortgages had been "settled" by August 24 by chronicling the lawyers' exchange of various draft APAs throughout the Diligence Period.[64] Winn emphasizes a July 6 draft APA in which Hogan had struck language – previously inserted by Kirkland – that would have shifted liability for the Vessel Mortgages to Winn at Closing.[65] Winn then argues that by failing to re-insert this

---

manifestations of the intent of the parties as gathered by their expressed words and deeds." (citation omitted)).

[62]    The LOI provides that the buyer may submit a Firm Offer *before* the Definitive Documents are "executed." LOI at 2. This provision is in tension, however, with the subsequent clause requiring a Firm Offer to be made "in accordance with the Definitive Documents." *Id.* The LOI provides no criteria by which the buyer could know when the material terms of the Definitive Documents are sufficiently near completion to sustain a Firm Offer.

[63]    Winn's Memorandum of Law in Opposition to Circle Line's Motion for Summary Judgment and in Further Support of Winn's Motion for Summary Judgment ("Pl. Opp. Mem.") at 3.

[64]    *See* Pl. Mem. at 4-9.

[65]    *See id.* at 4-5.

language in subsequent markups, Kirkland had "ratified" Hogan's deletions.[66]
Winn then leaps to the conclusion that because the draft APA that accompanied its
August 24 Letter was consistent with Hogan's July 6 draft (in that it provided for
Circle Line to retain liability for the loans), its letter constituted a Firm Offer under
the LOI.[67]

Similarly, the record with respect to the draft Schedules demonstrates
that the parties had failed to reach agreement concerning the Vessel Mortgages.
As described above, only two draft Schedules were ever exchanged between the
lawyers, and they were radically different in material respects.  On July 29,
Kirkland circulated a Schedules draft explicitly stating that the liability attendant to
the mortgages would pass with the vessels.  Before Hogan had responded with a
mark-up, Kirkland further notified Hogan that Circle Line had instructed its
counsel to cease negotiating the APA and its Schedules.  Nevertheless, Winn
argues that Kirkland "ratified" Hogan's August 12 draft of the Schedules – in
which the Hogan lawyer had written "Xs" over provisions expressly stating that
the vessel mortgages constituted asset encumbrances – by sending an email on

---

[66]    *Id*. at 4.  Elsewhere in its brief, Winn offers a "reliance" theory as an
alternative to its "ratification" theory.  Winn argues that Kirkland's failure to
reinsert certain language into draft APAs "led [Winn] to understand" that the issue
of the Vessel Mortgages had been "settled."  *Id*. at 6.  This theory is as unsupported
as Winn's ratification theory.

[67]    *See id*. at 4-6.

August 22 to a Hogan associate, stating "we have made the changes that you marked."[68]  Winn then argues that in light of Kirkland's ratification, Winn was "entitled to make the Firm Offer on the basis of the schedules as so agreed."[69] Winn asserts that this vague and ambiguous phrase by Kirkland "confirmed" that Circle Line had agreed to consummate the transaction in accordance with the Schedules as modified by Hogan.[70]  This argument is simply not supported by the record as a whole.[71]

Although the LOI allows for a Firm Offer to be submitted within the Diligence Period, it does not allow Winn to unilaterally determine when the negotiation or drafting process for any particular provision of the APA is concluded.  Under Winn's reading of the LOI, Winn could tender a Firm Offer at any time within the forty-five day Diligence Period and claim it did so in reliance

---

[68]     Pl. 56.1 ¶ 31 (citing Korff's August 22 email to Matthew Lubart, a Hogan associate).

[69]     Pl. Opp. Mem. at 6.

[70]     *Id*.  The email phrase on which Winn relies is taken out of context, given that later in that same email Korff wrote "the [Circle Line] board does not want to have employees devote time to completing the schedules . . . ."  Deposition of Joshua N. Korff, Ex. C to McCormick Decl., at 114.

[71]     Courts must be cautious not to put "disproportionate emphasis . . . on any single act, phrase or other expression, but, instead [should consider] the totality of all of these, given the attendant circumstances, the situation of the parties and the objectives they were striving to attain."  *Brown Bros. Elec. Contractors, Inc.*, 41 N.Y. 2d at 399-400 (citations omitted).

on Kirkland's failure to delete, reword, or re-insert certain language contained in a
previous Hogan markup.  Winn could then demand that Circle Line either accept
that language and consummate the transaction, or else pay Winn a large
reimbursement fee pursuant to the LOI's Reimbursement Right.  This reading
cannot be countenanced, as it eliminates any meaningful negotiation between the
parties.[72]

  In sum, neither the draft APAs nor the draft Schedules demonstrate
that the parties had reached an agreement with respect to which party would
assume liability for the Vessel Mortgages at Closing.  To the contrary, Circle Line
consistently communicated to Winn – in writing via comments and edits to the
drafts – that Circle Line wanted Winn to assume the Vessel Mortgages.  Winn
attempts to downplay the significance of Moran's September 21 and 29 letters, but
these letters demonstrate that negotiations were ongoing and that the Definitive
Documents were materially incomplete at the time of Winn's purported Firm
Offer.

  In requesting leave of the Court to file its motion, Winn represented
that the issues were ripe for summary judgment because it could "adduce evidence

---

[72] For a thorough discussion of why drafts of transaction documents circulated
by lawyers fail to be offers – *i.e.*, because of indefiniteness, lack of intent to make
an offer and the lawyers' lack of authority – see E. Allan Farnsworth,
*Precontractual Liability and Preliminary Agreements:  Fair Dealing and Failed
Negotiations*, 87 Colum. L. Rev. 217, 219 (1987).

that counsel for the seller had ratified" pertinent provisions of the APA.[73]  This was

plainly an overstatement.  As Circle Line contends, "it is inescapable that the

parties were still in the middle of a complex negotiating process involving many

players and that there had not been a meeting of the minds on this important

encumbrances term."[74]  Because the Definitive Documents remained materially

incomplete, the August 24 Letter was not a Firm Offer pursuant to the LOI.[75]

Thus, a condition precedent to Winn's exercise of its Reimbursement Right was

not met.  Accordingly, Circle Line's refusal to reimburse Winn for fees and

expenses incurred during the Diligence Period does not constitute a breach of

contract.

---

[73]    10/30/06 Pre-motion Conference Transcript, at 20.

[74]    Def. Mem. at 21.

[75]    I need not reach the issue of whether Circle Line's September 21 letter
constituted a Firm Offer Refusal, the second condition precedent to the buyer's
exercise of the Reimbursement Right.

## IV.    CONCLUSION

For the reasons stated above, Winn's motion for summary judgment is denied.  Circle Line's cross-motion is granted.  The Clerk of Court is directed to close these motions [Docket Nos. 12 and 18] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, NY
        March 21, 2007

## - Appearances -

*For Plaintiff:*

Steven G. Mintz, Esq.
Terence William McCormick, Esq.
Mintz & Gold LLP
470 Park Ave. South, 10th Fl. North
New York, New York 10016
(212) 696 4848

*For Defendant:*

George B. Freehill, Esq.
Eric E. Lenck, Esq.
Freehill, Hogan & Mahar, LLP
80 Pine Street
New York, New York 10005
(212) 425-1900